UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

—————————

No. 98-31
(CA-97-258-2)

—————————

Everett Lee Mueller,

Petitioner - Appellant,

versus

Ronald J. Angelone, etc.,

Respondent - Appellee.

—————————

O R D E R

—————————

The court amends its opinion filed June 14, 1999, as follows:

On page 16, first full paragraph, line 24 -- "See supra n.7" is corrected to read "See supra n.8."

On page 23, first full paragraph, line 9 -- the apostrophe on the word "officers" is deleted.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EVERETT LEE MUELLER,
Petitioner-Appellant,

v.

No. 98-31

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca B. Smith, District Judge.
(CA-97-258-2)

Argued: March 2, 1999

Decided: June 14, 1999

Before LUTTIG, MOTZ, and TRAXLER, Circuit Judges.

_____

Dismissed by published opinion. Judge Luttig wrote the opinion, in
which Judge Motz and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Jennifer Leigh Givens, VIRGINIA CAPITAL REPRE-
SENTATION RESOURCE CENTER, Richmond, Virginia, for
Appellant. Robert H. Anderson, III, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Appellee. **ON BRIEF:** Robert Edward Lee, Jr., VIRGINIA CAPI-
TAL REPRESENTATION RESOURCE CENTER, Richmond, Vir-

ginia; Thomas B. Shuttleworth, Lawrence H. Woodward, Jr., SHUTTLEWORTH, RULOFF & GIORDANO, Virginia Beach, Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

LUTTIG, Circuit Judge:

Everett Lee Mueller confessed on videotape to the rape and murder of ten-year old Charity Powers. He was subsequently convicted of, among other offenses, the rape and capital murder of Powers and sentenced by the jury to death. After exhausting state remedies, Mueller filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Virginia. The district court dismissed his petition and Mueller appeals. Concluding that none of Mueller's claims provides a basis for habeas relief, we deny his application for a certificate of appealability and dismiss the appeal.

I.

The following facts of the case, taken almost verbatim from the decision of the Virginia Supreme Court on direct appeal, are not in dispute.

On the evening of October 5, 1990, Taryn Potts dropped her 10-year old daughter, Charity Powers, off at a skating rink for the evening. Ms. Potts had arranged for a family friend to pick Charity up later that night. Tragically, the friend fell asleep and never made it to the rink. When Potts arrived home at 3:00 a.m. the next morning and discovered that Charity was not home, she immediately called the police.

Kevin Speeks, who knew Charity, later testified that he had seen her at a Hardee's restaurant near the skating rink at about 12:50 a.m. on October 6, 1990. Speeks also observed a white male, approximately thirty years old, medium height, with an unkempt appearance,

2

driving a cream-colored station wagon with wood siding through the Hardee's parking lot several times. Speeks also testified to seeing the same man standing by the side of the restaurant, near where Charity Powers was sitting on a curb. Everett Lee Mueller fit Speeks' general description and was known to drive a similar car.

In conversations with police on October 8 and 9, Mueller admitted speaking with a young, white female on the night of October 5, 1990, at a fast food restaurant near the skating rink that might have been Hardee's. As a result of information learned from intimates of Mueller's, the police searched for Charity's body near his home. On February 8, 1991, approximately 900 feet behind Mueller's house, investigators found "a clump of hair and what looked like some white bone sticking out of the ground." The police then exhumed Charity's body. One of the investigators also found a knife sticking in the ground about 174 feet from the grave site.

On February 12, 1991, the police arrested Mueller. After he was advised of his Miranda rights, Mueller agreed to talk with Detective Wayne R. Garber of the Chesterfield County Police Department and Special Agent John M. Palfi of the FBI. Garber and Palfi questioned Mueller, on videotape, for approximately four and one-half hours. Just over two hours into the questioning, Mueller confessed to having intercourse with and murdering Charity. Mueller stated that he had agreed to give Charity a ride home from the restaurant but that he drove her to his house instead. He admitted that he was thinking about having sex with her and he stated that he thought the 4'8", ninety-pound Charity was eighteen or nineteen years old. Mueller stated that she agreed to have sex with him, and told him that she wanted to go home afterwards. Mueller admitted taking Charity to the woods behind his house and having intercourse with her there. He stated that although he had a knife nearby, he did not use it.

Mueller told the investigators that he then strangled Charity to death because he was afraid that she would report the incident to the police. He also claimed that he had been drinking heavily on the night of the murder and that, the next morning, he did not know whether he had dreamed about the previous night's events or whether they had actually occurred. According to Mueller, when he went to check the woods, he saw Charity's body. He then purchased a shovel from a

3

local store, buried the body, and burned Charity's clothes and jewelry nearby.

After making this confession, Mueller led the police to the site where he had buried the body. He also brought them to where he had burned the clothing and jewelry, as well as to the area where he had left the knife. This was the same area where the police had earlier found a knife. Additionally, Mueller indicated that he had had intercourse with Charity in an area that was approximately fifteen feet from where the knife was found.

The doctor who conducted the autopsy on Charity's body testified that her throat had been cut to the depth of one inch, and that the cause of death was an "acute neck injury." She also testified that there were "irregular holes in the area where each nipple would be," which she believed to be the result of an injury, but could not determine their cause or whether they occurred before or after death. Finally, the doctor testified to the existence of evidence consistent with sexual penetration.

On September 11, 1991, Mueller was convicted after a jury trial in the Chesterfield County Circuit Court of abduction with intent to defile and of rape, for which he was sentenced to two life terms. He was also convicted of capital murder in the commission of abduction with intent to defile and of capital murder in the commission of, or subsequent to, rape. After a capital sentencing hearing on September 12, the jury found Mueller to be a future danger and his crime to be vile, and sentenced him to death on the two capital murder counts.[1]

_____

[1] At Mueller's sentencing hearing, the Commonwealth introduced evidence detailing petitioner's long history of sexual assaults. Four women, Kimahli Peregoy, Laura Kesterson, Carol Newsome, and the defendant's own sister Carol Mueller, testified that he had raped them at knife point. Mueller's testimony on his own behalf was perhaps even more damaging to his cause. He asserted that the videotape of his confession had been altered and that he was innocent, admitting only to burning Charity's clothes and, a week later, burying her body. When asked if he felt any remorse for the rape of Kimahli Peregoy, Mueller responded: "Which one is that? Ha, ha." As he was leaving the witness stand, Mueller said, "Get this God damn shit over with so that I can go smoke a cigarette."

4

Mueller appealed to the Supreme Court of Virginia, which affirmed in all respects, Mueller v. Commonwealth, 422 S.E.2d 380 (1992) ("Mueller I"), and subsequently denied his petition for rehearing. Mueller next filed a petition for a writ of certiorari in the Supreme Court of the United States, which was denied on April 19, 1993. Mueller v. Virginia, 507 U.S. 1043 (1993). Having exhausted his options on direct appeal, Mueller then initiated state habeas proceedings by filing a petition in the Circuit Court of Chesterfield County. The Circuit Court dismissed the petition, and Mueller filed a petition of appeal in the Virginia Supreme Court. By order dated April 1, 1996, that court awarded an appeal, limited to a single assignment of error challenging the exclusion of evidence or argument dealing with Mueller's parole status. After briefing and oral argument, the Virginia Supreme Court affirmed the denial of habeas corpus relief, Mueller v. Murray, 478 S.E.2d 542 (1996), and on June 10, 1997, the court denied his petition for rehearing.

Having exhausted all available state remedies, Mueller filed his first petition for federal habeas corpus relief under 28 U.S.C. § 2254 on July 18, 1997. The district court referred the petition to a Magistrate Judge, who applied the revisions to chapter 153 of Title 28 of the United States Code (including revisions to section 2254) enacted on April 24, 1996, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA") and recommended dismissal. The district court entered an opinion and final order on August 7, 1998, dismissing his habeas petition. Mueller appeals.[2]

II.

Before reaching the merits of his appeal, we first consider Mueller's arguments that the AEDPA should not apply to him because its application has an impermissible retroactive effect and that, in any event, the Act is unconstitutional because it requires federal courts to abdicate their obligation to exercise the judicial power to enforce the Supremacy Clause of the United States Constitution. U.S. Const., Art.

_____

[2] Mueller named Ronald Angelone, Director of the Virginia Department of Corrections, as Respondent in his petition. For ease of reference, we refer to the respondent as "the Commonwealth" throughout this opinion.

VI, ¶ 2. Both arguments are without merit, the second bordering on the frivolous. We consider them in turn.

A.

We address first petitioner's contention that the district court erred in applying the AEDPA to his habeas petition because the new section 2254 had an impermissible retroactive effect in his case. Specifically, petitioner argues that the Supreme Court did not intend its holding in Lindh v. Murphy, 521 U.S. 320 (1997), that "the new provisions of chapter 153 generally apply only to cases filed after the Act became effective," id. at 336, to extend to cases filed after the date of enactment, like his, in which the Act's application would have a genuinely retroactive effect on a petitioner's pre-enactment litigation conduct.[3]

Disposition of this claim requires us to consider the apparent tension between two sets of recent courts of appeals cases. In the first, we and other courts of appeals have explicitly read Lindh to hold that the AEDPA amendments to chapter 153 of Title 28 of the United States Code apply to every petition filed after the date of the Act's enactment. In the second, we and other courts have read Lindh, more narrowly, as permitting application of several of the new provisions of the chapter only where the effect of doing so is not impermissibly retroactive. Petitioner argues that the latter understanding of Lindh is the correct one, and that application of the new section 2254 to his case has exactly that impermissible retroactive effect. Although we agree with petitioner's interpretation of Lindh, we disagree with his claim because we conclude that the amended section 2254 does not have an impermissible retroactive effect under the analytical framework of Landgraf v. USI Film Products, 511 U.S. 244 (1994). We therefore reaffirm our earlier holdings applying that section as amended to cases filed after the enactment date of the Act.

_____

[3] Sections 101-06 of Title I of the AEDPA amended sections 2244 and 2253-55 of chapter 153 of Title 28 of the United States Code, which govern all habeas corpus proceedings in the federal courts. 110 Stat. 1217-1221. Section 107 of the Act created a new chapter 154, which establishes special rules applicable in federal capital habeas corpus proceedings if a State meets certain conditions.

6

(1)

In Lindh, the Supreme Court reversed a decision of the Seventh Circuit that the new provisions of chapter 153 applied to non-capital federal habeas cases pending on April 24, 1996, the date of the AEDPA's enactment. Lindh v. Murphy, 96 F.3d 856 (1996). The Court did not, however, dispute -- or even, in fact, directly address -- the Seventh Circuit's conclusion that application of the new section 2254 to cases pending at the date of the Act's enactment would not have an impermissible retroactive effect under Landgraf. Rather, employing "normal rules of construction," the Court concluded, from the language of the Act, that Congress had intended "to apply the amendments to chapter 153 only to such cases as were filed after the statute's enactment," Lindh, 521 U.S. at 326, and thus not to cases pending at enactment. For this latter class of cases, the Court held, it was clear that Congress had "remove[d] even the possibility of retroactivity." Id. (emphasis added). The Court divined Congress' intent regarding chapter 153 by drawing the negative implication from section 107(c) of the Act, which explicitly extends the newly-created chapter 154 to cases pending on the date of enactment.[4] The Court thus dispensed with the necessity of undertaking a Landgraf retroactivity analysis, concluding that Congress' inferred intent not to apply the new provisions of chapter 153 to pending non-capital habeas cases was dispositive of the reach of those provisions.

The Court in Lindh framed its holding by stating "that the negative implication of sec. 107(c) is that the new provisions of chapter 153 generally apply only to cases filed after the Act became effective." Lindh, 521 U.S. at 336 (emphasis added). Many courts, including this one, have cited this statement in support of the proposition that the provisions of the AEDPA amending section 2254 necessarily do apply to habeas petitions filed after April 24, 1996, the date on which the Act was signed into law and became effective. See, e.g., Green v. French, 143 F.3d 865, 868 (4th Cir. 1998), cert. denied, 119 S. Ct. 844 (1999); Breard v. Pruett, 134 F.3d 615, 618 (4th Cir.), cert. denied sub nom. Breard v. Greene, 523 U.S. 371 (1998); Rivera v.

_____

[4] Section 107(c) of the Act provides that "Chapter 154 . . . shall apply to cases pending on or after the date of enactment of the Act." 110 Stat. 1226.

7

Sheriff of Cook County, 162 F.3d 486, 489 (7th Cir. 1998); Fields v. Johnson, 159 F.3d 914, 915 (5th Cir. 1998); Neelley v. Nagle, 138 F.3d 917, 921 (11th Cir. 1998), cert. denied, 119 S. Ct. 811 (1999).

Several courts, including this one, however, have recently concluded, in considering whether other of the new provisions of chapter 153 apply to cases filed after the date of enactment, that "[t]he Court's holding [in Lindh] that Chapter 153 generally applies only to cases filed after enactment does not imply that it applies where a retroactive effect would thereby result." In re Hanserd, 123 F.3d 922, 933 n.22 (6th Cir. 1997) (holding that the AEDPA did not apply to bar filing of second or successive petition under section 2255 where first petition was filed before date of enactment). See In re Minarik, 166 F.3d 591 (3rd Cir. 1999) (concluding, after thorough analysis, that Lindh did not mandate application of amended section 2244's limitation on the filing of second or successive federal habeas petitions to a case in which its application would have a genuine retroactive effect). Most significantly, this latter understanding of the limits of the Court's holding in Lindh has also been confirmed on one occasion by this court. In Brown v. Angelone, 150 F.3d 370 (4th Cir. 1998), we modified the application of the new one-year statute of limitations on habeas petitions to cases in which a conviction became final more than one year prior to the date of the AEDPA's enactment. Noting that under Lindh, new section 2244(d)(1) "generally appl[ied]" to the case, the panel nonetheless employed Landgraf's analytical framework to determine whether we would apply its statute of limitations to petitions filed after enactment by prisoners whose statutory right to seek federal habeas relief had accrued prior to the AEDPA's enactment. Id. at 372. Because the effect of applying section 2244(d) (as well as section 2255, the analogous statutory provision governing habeas petitions filed by federal prisoners) to bar such petitions would have been impermissibly retroactive, we joined six of our sister circuits in extending the limitations period in such cases for one year after the date of enactment, regardless of the date of accrual. See United States v. Flores, 135 F.3d 1000, 1002-04 (5th Cir. 1998), cert. denied, 119 S. Ct. 846 (1999); Burns v. Morton, 134 F.3d 109, 111 (3rd Cir. 1998); Calderon v. United States Dist. Ct. for the Cent. Dist. of Cal., 128 F.3d 1283, 1287 n.3 (9th Cir. 1997), overruled on other grounds, 163 F.3d 530 (9th Cir. 1998); United States v. Simmonds, 111 F.3d 737, 744-46 (10th Cir. 1997); Peterson v. Demskie, 107

8

F.3d 92, 93 (2d Cir. 1997); Lindh, 96 F.3d at 865-66. Mueller argues that the Landgraf analysis applies as well to the application of section 2254 to his case, and that even after Lindh, amended section 2254 is not applicable to a petition filed post-enactment if such application would not pass muster under Landgraf.

We agree with petitioner and those courts that, having had cause to consider the question in full, have concluded that the Supreme Court did not hold in Lindh that courts are necessarily to apply the new provisions of chapter 153 to all habeas petitions filed after April 24, 1996. More particularly, we hold that Lindh did not foreclose -- and indeed contemplated -- continuing resort to the Landgraf analysis in order to ensure that application of chapter 153's new provisions is not impermissibly retroactive in such cases.

One could be forgiven for taking a contrary meaning from the Court's delphic statement of its holding in Lindh. As recounted above, the Court held in Lindh that the "negative implication of § 107(c) is that the new provisions of chapter 153 generally apply only to cases filed after the Act became effective." Lindh, 521 U.S. at 336 (emphasis added). The most natural reading of this concluding language -- and the one courts have appeared uniformly to adopt in the absence of a direct challenge to a new provision's retroactivity in a case filed post-enactment -- is that the new provisions of chapter 153 will apply to cases filed after enactment and will only apply to those cases, except in those limited circumstances, discussed at some length earlier in the opinion, in which because of section 107(c) and the incorporation by chapter 154 of certain provisions of chapter 153, these provisions apply as well to pending capital habeas cases. See Lindh, 521 U.S. at 326 ("The statute reveals Congress's intent to apply the amendments to chapter 153 only to such cases as were filed after the statute's enactment (except where chapter 154 otherwise makes select provisions of chapter 153 applicable to pending cases.")). Thus, at first blush, the Court's holding could appear simply to be that the new provisions of chapter 153, including section 2254, apply to all cases filed after enactment of the AEDPA, but that some of the new sections will apply, where explicitly provided for, in a broader class of cases as well.

While this interpretation of the Court's language is correct on one level, it is, in a fundamental sense, incomplete. Although the Court in Lindh did "remove the possibility" of the new provisions applying to pending cases, it did not mean to suggest that in cases filed after enactment the new provisions would necessarily apply. Rather, the Court left open the possibility, consistent with Landgraf, that it would not apply the new provisions of chapter 153 even to a post-enactment petition if doing so would result in an impermissible retroactive effect. See Lindh, 521 U.S. at 326 ("In sum, if the application of a statutory term would be retroactive as to [petitioner], the term will not be applied, even if in the absence of retroactive effect, we might find the term applicable."). On this reading of Lindh, the Court's holding that the AEDPA generally applies only to that class of cases filed post-enactment[5] was not intended to supersede, even with respect to the new chapter 153 provisions, the Landgraf rule that a new statute will not be applied in any case in which its application would have a genuinely retroactive effect unless Congress has clearly manifested its intent to override the judicial presumption against such retroactivity. See Lindh, 521 U.S. at 328 (noting the "clear statement required

_____

[5] As the Seventh Circuit recognized, the category of cases defined as those "filed after the date of enactment" is actually comprised of several different classes of cases for the purpose of identifying retroactive effect. For instance, the category encompasses those cases in which the relevant primary conduct -- the crime itself -- was committed after April 24, 1996, as well as cases in which the primary conduct was completed before April 24, 1996 but all secondary conduct-- state court proceedings -- took place after the enactment date and, finally, cases like the one before us today, in which both the crime and all state court proceedings were completed before April 24, 1996, but the federal habeas petition was not filed until after that date. See Lindh, 96 F.3d at 861. Although none of these types of cases presents classic retroactivity concerns, see Pratt v. United States, 129 F.3d 54, 58 (1st Cir. 1997) (beginning its retroactivity analysis "by remarking the obvious: applying a statute to a pleading that was filed after the statute's effective date is not really a `retroactive' application in the classic sense"), all are nonetheless subject under Landgraf to a retroactivity analysis. See Landgraf, 511 U.S. at 268 (noting that deciding "when a statute operates `retroactively' is not always a simple or mechanical task," and that "[t]hough the formulas have varied, similar functional conceptions of legislative `retroactivity' have found voice in this Court's decisions and elsewhere").

10

for a mandate to apply a statute in the disfavored retroactive way"); id. at 325 (reiterating Landgraf requirement of an "express command" or "unambiguous directive" before a retroactive application will be authorized).

To put the point differently, the word "apply" in the Court's statement of its holding is, at first glance, ambiguous, for there are two different senses in which an arguably retroactive statute might be said to "apply" to a case. First, a court must determine, through its normal rules of statutory construction, whether (in the first sense) the statute "applies" to the category of cases to which the case before it belongs. If the court concludes that the statute does not, as was the case in Lindh, the analysis ends. If, however, the court determines under normal rules of statutory construction that the statute does indeed "apply" to that class of cases -- that is to say, the possibility of its application has not been removed by Congress -- the court must then proceed to the Landgraf analysis before it may actually "apply" the law (in the second sense) to the case before it. Lindh did not purport to eliminate the necessity of the Landgraf step; the Court in Lindh simply had no need to reach that step. Thus, when the Court held that the AEDPA "applies" to cases filed after the Act's effective date, it did so only in the first sense of "apply" -- what normal rules of interpretation tell us about an Act's reach -- and not in the second sense -- whether, after one conducts a Landgraf analysis, the Act will, ultimately, "apply" either because of the absence of impermissible retroactive effect or because of a clearly stated congressional intent to override one.

Further, we do not read Lindh to suggest that the Court, by resorting to negative implication in order to remove an entire class of potentially troublesome cases from a statute's reach, had also found the express command that Landgraf requires for a statute to apply to a different class of cases with respect to which its application might yet have retroactive effect. See In re Minarik, 166 F.3d at 598 ("Landgraf and Lindh make clear . . . that while such an inference is sufficient to eliminate the possibility of a retroactivity problem, it is not the kind of unambiguous statement that will justify overriding the judicial presumption against retroactivity in a case where a retroactivity problem exists."). But see Graham v. Johnson , 168 F.3d 762, 781 (5th Cir. 1999) (reading Lindh to recognize implicit congressional intent as sat-

11

isfying <u>Landgraf</u> clear statement requirement). Quite to the contrary, the <u>Lindh</u> majority was not even prepared to state that the explicit extension (in section 107(c)) of chapter 154 to pending cases would prove sufficiently unambiguous to override the judicial presumption against retroactivity. <u>Lindh</u>, 521 U.S. at 328-29 (noting that "the terms of § 107(c) may not amount to the clear statement required for a mandate to apply a statute in the disfavored retroactive way" and that even with respect to chapter 154 there "may well be difficult issues . . . that application of <u>Landgraf's</u> default rule will be necessary to settle").

Accordingly, like our sister circuits in <u>Minarik</u> and <u>Hanserd</u>, we conclude that the Court in <u>Lindh</u> did not foreclose the possibility that in certain cases filed after enactment, certain of the new provisions, because of an impermissible retroactive effect, still could not, consistent with the Court's retroactivity precedents, be applied. Petitioner claims that his is such a case and section 2254 is such a provision. We disagree.

(2)

In applying the <u>Landgraf</u> analysis to petitioner's claim, we are mindful that

> [a] statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment.

<u>Landgraf</u>, 511 U.S. at 269-70. In conducting this inquiry into whether the amendments to section 2254 attach any "new legal consequences," we apply "familiar considerations of fair notice, reasonable reliance, and settled expectations." <u>Id</u>. Thus, the teaching of <u>Landgraf</u> is that courts should not apply a new law, absent an express command from Congress, where to do so would attach new legal consequences such that the party affected might have acted differently had he known that his conduct would be subject to the new law.[6] Mueller has failed to establish that the new section 2254 has any such disfavored effect.

_____

[6] There has been some disagreement among the courts of appeals over the character of reliance <u>Landgraf</u> contemplates. While several courts of

12

Petitioner does not argue that his conduct on the night of the murder was in any way affected by his understanding of or reliance on the scope of the federal habeas remedy as it existed at that time. Instead, petitioner bases his claim of impermissible retroactivity on two arguments that he relied to his detriment on the rules governing pre-AEDPA federal habeas review in formulating his litigation strategy in the state courts, and one that the state courts similarly relied to his detriment on the prospect of de novo federal habeas review of their federal constitutional judgments. These three arguments are equally without merit.

First, petitioner contends that section 2254(d) has an impermissible retroactive effect because, under the pre-AEDPA regime, he had the obligation only to exhaust his state court remedies in order to be guaranteed independent and de novo review of his federal constitutional claims by the federal habeas court. Consequently, Mueller argues, he lacked any incentive to pursue in state court the merits adjudication of his legal claims which he argues is a prerequisite to review under the new section 2254(d).[7] The gravamen of Mueller's argument, as

_____

appeals have interpreted Landgraf to require a showing of actual detrimental reliance to establish retroactivity, see, e.g., Graham v. Johnson, 168 F.3d 762, 783-86; Alexander v. United States, 121 F.3d 312, 313 (7th Cir. 1997), at least one has held that the party claiming an impermissible retroactive effect must go further and demonstrate that his detrimental reliance was objectively reasonable, Pratt v. United States, 129 F.3d 54, 59 (1st Cir. 1997), while another would require a litigant only to show that he might have so relied. Hanserd, 123 F.3d at 931. Although Mueller himself alleges, albeit obliquely, actual detrimental reliance, we need not reach the question of the proper standard today because we do not believe Mueller can establish retroactivity under any of these understandings.

[7] 28 U.S.C. § 2254(d) reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

13

best we can discern from its rather elliptical presentation, is that he would have tried harder to secure an adjudication of all his non-defaulted claims had he known that the AEDPA would govern his federal petition.

This argument is meritless, and obviously so. In the first place, we find the notion absurd that, prior to the AEDPA, state court defendants and state habeas petitioners had "no incentive" to pursue adjudication on the merits of their federal constitutional claims. Especially since the state court legal determinations were subject, as petitioner argues, in many cases to de novo federal habeas review, there simply was no downside for defendants like Mueller to receiving an adjudication on the merits in state court.[8] Petitioner would have us accept the curious premise that prisoners pre-AEDPA willingly forewent their first free bite at the apple, and for no apparent gain -- except, we suppose, in order better to savor their final bite in federal court.[9]

_____

law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[8] Petitioner argues that in fact he could have expected de novo federal review of all claims fairly presented in state court. What this contention fails to acknowledge, however, is that the scope of the federal habeas remedy of federal constitutional violations was significantly limited even before passage of the AEDPA. See, e.g., Teague v. Lane, 489 U.S. 288 (1989) (establishing the "new rule" doctrine); Stone v. Powell, 428 U.S. 465 (1976) (declining to review Fourth Amendment claims on federal habeas review).

[9] To the extent that a defendant might ever be inclined to "sandbag" his own claim in state court in the way petitioner seems to envision -- that is, present the claim so as to preserve it but at the same time maneuver (precisely how it is unclear) to avoid the possibility of an adjudication on the merits -- he would seem to have more incentive to do so under the AEDPA than before. Under the AEDPA, the fact of a state court adjudication on the merits of a federal constitutional claim will subject the federal habeas petitioner to the new section 2254(d)'s restrictions on the right to habeas relief as explicated in Green v. French, 143 F.3d at 869-74. Conversely, a claim that was not adjudicated on the merits, even

14

In any event, petitioner's claim of retroactivity fails because, whatever he perceives to have been the change in "incentives," there is no conceivable way that his litigation strategy in the state court could actually have been affected by his alleged reliance on these incentives. As petitioner recognizes, prior to the adoption of the AEDPA, as now, the federal courts were barred from reviewing claims before state remedies were exhausted, or if the claims were procedurally defaulted at the state level (absent cause and prejudice or a fundamental miscarriage of justice that would excuse the default). Harris v. Reed, 489 U.S. 255, 262 (1989). Therefore, in order to preserve a claim for federal review, petitioner had to present it in state court. And once a claim is presented for consideration, it is in the hands of the court, not the prisoner, whether that claim is ultimately adjudicated on the merits. Thus, whatever the incentives before or after passage of the AEDPA, petitioner simply cannot show how he would have proceeded differently with respect to his state court litigation efforts, and as a result has failed in this regard to demonstrate any retroactive effect. See Drinkard v. Johnson, 97 F.3d 751, 766 (5th Cir. 1996) ("[Petitioner] cannot argue credibly that he would have

_____

in a summary fashion, and which is not procedurally defaulted, would seem to fall outside the new section 2254(d) and its limitations on the scope of the habeas remedy. See Weeks v. Angelone, 1999 WL 288504, at *5 (4th Cir. May 10, 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, however, our review of questions of law and mixed questions of law and fact is de novo."); Jones v. Jones, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying pre-AEDPA de novo standard of review to claims of ineffective assistance of counsel that were properly raised, but not adjudicated on the merits in state court). As a result, if the goal is, as petitioner suggests, for a state habeas petitioner simply to maximize the number of federal constitutional claims subject to de novo federal habeas review, his incentive post-AEDPA would actually be to avoid, rather than assure, state court adjudication on the merits of his federal constitutional claims. Thus if, as petitioner also suggests (although importantly he does not present a single concrete example), he did not actively pursue an adjudication on the merits of his legal claims in state court, the changes to section 2254(d) might actually have redounded to his benefit, and his claim of impermissible retroactivity would even more surely fail.

15

proceeded any differently during his state post-conviction proceedings had he known at the time of those proceedings that the federal courts would not review claims adjudicated on the merits in the state court proceedings de novo.").

Second, petitioner argues -- states, really -- that prior to the AEDPA, he was not required to have exhausted all of his claims on certiorari to the Supreme Court on direct appeal, with the implication being that he omitted some claims from his petition for a writ of certiorari that he would have included had he foreseen the tougher habeas standard by which those claims would ultimately be measured. But petitioner cannot show any harm from this change in the scope of his federal habeas remedy because he has not specified even a single claim that he omitted, in reliance on a de novo habeas review, from his petition for a writ of certiorari, which was denied in full by the Supreme Court. In fact, petitioner does not even explicitly assert that he did so with respect to any claim. We will require more in the way of legal or factual support for a claim of actual detrimental reliance than mere suggestion or innuendo. See, e.g., Pratt, 129 F.3d at 58. And, indeed, we find even the suggestion that petitioner might have withheld legitimate claims from his petition for certiorari so that they would be considered by a federal court for the first time on habeas review illogical and thus unpersuasive. Petitioner had no particular incentive pre-AEDPA to reserve his claims-- especially those with any merit -- for habeas review. In fact, just the opposite was true. Even at the time Mueller filed his petition for certiorari, the Supreme Court on direct review had greater authority to correct constitutional errors than a lower federal court sitting in habeas review. See supra n.8. Thus, the incentive for defendants like Mueller has not changed -- then, as now, the incentive was to petition the Supreme Court for certiorari on all colorable claims.

Finally, petitioner argues that the state courts that considered his claims prior to passage of the AEDPA lacked incentive to review diligently his federal claims because the courts were not aware at the time of decision of the increased deference to their legal conclusions the new 2254(d) would ultimately mandate. Like the Seventh Circuit in Lindh, we are unwilling, particularly in the absence of any factual support for the proposition, to assume that state courts, comforted by the prospect of independent and de novo federal review, were less

16

than attentive pre-AEDPA to any defendant's federal constitutional claims. Lindh, 96 F.3d at 864. See also Stone, 428 U.S. at 494 n.35 ("We are unwilling to assume that there now exists a genuine lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States."). In fact, it seems at least as likely that state courts, discomfited by the certain prospect of plenary federal review, and no doubt possessed of the familiar judicial aversion to "reversal" -- especially by a court with respect to which they are in no way inferior -- would have been, if possible, more rather than less attentive to petitioner's federal constitutional claims. We thus conclude that petitioner has not identified any new legal consequences that, had he known of them in advance, might have in any way affected his conduct before filing his federal habeas petition, and that he has identified no retroactive effect, impermissible or otherwise, under Landgraf.

Accordingly, we conclude that the district court did not err in reviewing Mueller's habeas petition under the 1996 Act.

B.

Next, petitioner asserts that § 2254(d) is unconstitutional because by prohibiting federal courts from "taking any action whatsoever to correct or remedy" a "clear violation of the Constitution," Br. of Appellant at 7, it prevents them from exercising the "judicial power" to enforce the Supremacy Clause of the Constitution. U.S. Const. art. VI, ¶ 2. Because this claim is nothing more than an awkwardly reconfigured version of constitutional objections already rejected by both us and the Supreme Court, we may summarily dispose of it.

As the Magistrate Judge correctly explained, the Supremacy Clause, which establishes the Constitution as "the supreme Law of the Land" and commands state court obeisance to it, is simply inapposite to petitioner's essential objection that § 2254(d) impermissibly limits the scope of federal habeas review. The Supremacy Clause, as the Magistrate noted, "is concerned about a conflict between state and federal law, not between state and federal judges." J.A. at 225. Indeed, to say, as the Clause does, that federal law shall be "Supreme . . . any Thing in the Constitution or Laws of any State to the Contrary

17

notwithstanding," is to say nothing at all about the respective roles of the state and federal courts.

Petitioner's real argument, of course, sounds not in the Supremacy Clause, but in the Suspension Clause, U.S. Const., Art. II, § 9 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."), and Article III itself. At its essence, petitioner's contention is that the AEDPA unconstitutionally strips the federal courts of some component of the "judicial power" vested in them by Article III. Petitioner dresses this claim up in the ill-fitting garb of the Supremacy Clause only because his actual Article III and Suspension Clause arguments have been squarely foreclosed by our decision in Green v. French that section 2254(d) did not unconstitutionally restrict the scope of federal habeas review, but rather "only place[d] an additional restriction upon the scope of the habeas remedy in certain circumstances," Green, 143 F.3d at 874, and by the Supreme Court's decision in Felker v. Turpin, 116 S. Ct. 2333 (1996), that the AEDPA's elimination of a federal petitioner's right to appeal or seek certiorari review of a court of appeals denial of authorization to file second or successive habeas petition did not constitute a violation of the Suspension Clause. Thus, because petitioner's Supremacy Clause gloss adds nothing to the claims of unconstitutionality already rejected by this court and the Supreme Court, we reiterate our holding in Green that § 2254(d) did not work an unconstitutional limitation upon the jurisdiction of federal habeas courts, but rather "represent[ed] a modest congressional alteration of the standards pursuant to which the writ issues." Green, 143 F.3d at 875. **10**

_____

**10** Petitioner raises several other general objections to the district court's application of the AEDPA to his numerous claims. We find them all to be without merit, and mention two briefly here. First, Mueller argues that the district court did not apply section 2254(d) in the manner prescribed by this court in Green. We need not consider whether the district court erred in its specific application of the new section 2254(d) because our own independent review of petitioner's claims confirms that the state courts did not decide any question "by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable," Green, 143 F.3d at 870.

Second, we reject petitioner's contention that the district court was not authorized to apply the new section 2254(d)'s deferential standard of

18

III.

Turning now to the merits of petitioner's claims for habeas relief, we consider first his contention that his February 12, 1991, confession was obtained in violation of his rights against self-incrimination and to counsel. Although petitioner does not dispute that he was advised of and explicitly waived his Miranda rights at the outset of his interrogation, he contends that subsequent exchanges with police required them to cease their interrogation and, when they did not, rendered his initial waiver ineffective. He is wrong on both counts.

Petitioner's principal Miranda claim centers around the following exchange, midway through his more than four-hour interrogation, with Detective Garber. Just over 2 hours into the February 12 interrogation, a visibly exacerbated FBI Special Agent Palfi, in his role as "bad cop," left Mueller alone in the room with "good cop" Garber. Shortly thereafter, Mueller looked at Garber and asked "Do you think

_____

review to claims that had simply been "decided" in summary fashion by the Virginia Supreme Court on habeas review, rather than "adjudicated on the merits." As we recently held in Thomas v. Taylor, 1999 WL 140596 (4th Cir., Mar. 16, 1999), "the phrase `adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Id. at *8 (citing Wright v. Angelone, 151 F.3d 151, 156-57 (4th Cir.), cert. denied, 119 S. Ct. 313 (1998); Green v. Johnson, 116 F.3d 1115, 1121 (5th Cir. 1997); Hennon v. Cooper, 109 F.3d 330, 334-35 (7th Cir.), cert. denied, 118 S. Ct. 72 (1997). See also Weeks v. Angelone, 1999 WL 288504, *6 (4th Cir. May 10, 1999) ("[T]he writ will not issue unless we determine that the Supreme Court of Virginia's [summary] disposition of [a] claim was either contrary to federal law as determined by the Supreme Court or an application or interpretation of Supreme Court precedent "that reasonable jurists would all agree," Green v. French, 143 F.3d 865, 870 (4th Cir. 1998), was not "`minimally consistent with the facts and circumstances of the case,'" Wright, 151 F.3d at 157 (quoting Hennon, 109 F.3d at 335)). In addition, the merits of petitioner's claims regarding the inadmissibility of his confession, see infra Part III, and the prosecution's failure to disclose exculpatory material, see infra Part IV, were discussed at some length before being rejected by the Virginia Supreme Court on direct appeal. See Mueller I, 422 S.E.2d at 386-87, 394.

19

I need an attorney here?" Both sides agree that the videotape of the interview shows that Garber responded by shaking his head slightly from side to side, moving his arms and hands in a "shrug-like manner," and stating "You're just talking to us." Six minutes later, Mueller began confessing to Charity's murder.

Petitioner argues first that under clearly established Supreme Court precedent, Garber was required to cease all questioning after Mueller asked him whether he thought that he (Mueller) needed an attorney. We disagree. The Virginia Supreme Court properly held on direct appeal that Mueller's question to Detective Garber did not constitute an "unambiguous request for counsel," and thus did not implicate the rule of Edwards v. Arizona, 451 U.S. at 477 (1981), that "custodial interrogation must cease, when the accused, having received Miranda warnings and having begun to respond to the questions of the authorities, `has clearly asserted his right to counsel.'" Mueller I, 422 S.E.2d at 387 (quoting Eaton v. Commonwealth, 397 S.E.2d 385, 395-96 (1990) (quoting Edwards, 451 U.S. at 485)). The Virginia Supreme Court correctly concluded that Mueller could not prevail on a claim that his lone query whether his interrogator thought that counsel might be helpful constituted a clear assertion of his right to counsel. In fact, just two years after the Virginia Supreme Court so concluded, the United States Supreme Court in the case of United States v. Davis, 512 U.S. 452, 459 (1994), explained, in virtually the same terms, that a suspect must "unambiguously request counsel" before officers are required to stop questioning him.[11] The Court's discussion in Davis conclusively demonstrates that the Virginia high court not only reasonably but correctly applied existing Supreme Court precedent. The Supreme Court stated in Davis that it was "declin[ing] petitioner's

_____

[11] In Lockhart v. Fretwell, 506 U.S. 364 (1993), the Supreme Court held that, consistent with the rationale of Teague, a federal habeas court may consider intervening decisions of the Supreme Court that support the state court's unfavorable adjudication of a prisoner's claim. The Supreme Court's intervening decision in Davis, if applicable, squarely forecloses petitioner's claim. Because we conclude above that the Virginia Supreme Court did not apply the relevant existing precedent in a manner that reasonable jurists would find unreasonable, we need not consider whether the Lockhart rule survives enactment of the AEDPA, rendering Davis controlling authority.

20

invitation to extend Edwards and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." Davis, 512 U.S. at 459 (emphasis added). In declining to extend Edwards to cover such statements, the Court thus unambiguously confirmed that it had not in Edwards "clearly established" such a rule.

Petitioner next claims that even if his query did not require the police to halt their interrogation, Garber's response to that query nonetheless invalidated his initial waiver. Again, we disagree.

In Moran v. Burbine, 475 U.S. 412 (1986), the Supreme Court explained that a suspect's waiver of his Miranda rights is only valid if it is made "voluntarily, knowingly, and intelligently." The Court further explained that this inquiry had two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. at 421 (internal quotation and citation omitted). Mueller does not assert that his initial waiver was invalid. Rather, petitioner's claim is that his waiver, voluntary, knowing, and intelligent when given, was subsequently rendered ineffective by Garber's response. Thus, Mueller can only prevail by showing that under the totality of the circumstances, Garber's response made Mueller's continuing waiver the product of other than a free and deliberate choice, or that after Garber's response Mueller no longer understood the nature of the right to an attorney or the consequences of abandoning it.

We conclude that Garber's shrug, shake of the head, and non-committal statement that "you're just talking to us," did not serve to render Mueller's waiver involuntary, unknowing, or unintelligent. As

21

the Virginia Supreme Court noted in conducting its own "totality of the circumstances" review: at the time of his arrest Mueller was 42 years old and had a GED; Garber advised Mueller of his rights prior to the interrogation and Mueller stated that he understood those rights; earlier in the investigation (on October 9), Mueller signed a Miranda waiver form, and on two occasions thereafter exercised his right to terminate police questioning; and several years earlier Mueller had waived his Miranda rights on three occasions in writing before giving a statement to the police. Mueller I, 422 S.E.2d at 386-87. On the basis of these facts, which we presume to be correct subject to rebuttal by clear and convincing evidence, 28 U.S.C.§ 2254(e)(1), we cannot conclude that reasonable jurists would have found unreasonable the Virginia Supreme Court's determination that Garber's response did not invalidate the earlier warning.

Petitioner's argument on appeal hinges on his assertion that the videotape demonstrates that the Virginia Supreme Court unreasonably concluded that Garber's response did not constitute an "unambiguously negative reply" to Mueller's query. However, even if we agreed that Garber unambiguously answered in the negative Mueller's question "Do you think I need an attorney?", our confidence in the conclusion that the waiver remained voluntary, knowing, and intelligent, would not be shaken. It is clear from the record that Mueller, with his extensive experience in such matters, understood both his rights and the consequences of their abandonment. Garber's expression of his opinion on the advisability of Mueller's consulting with counsel could not change that understanding. Mueller confirmed as much himself when he stated, shortly after confessing, that "I got death coming to me. I knew it as soon as I opened my mouth." 422 S.E.2d at 386. We note as well that whatever Garber's thoughts on the matter, he was under no obligation to share them with Mueller in order to help him decide how best to exercise his rights. See Burbine, 475 U.S. at 422 ("No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."). Accordingly, we conclude that Mueller's waiver remained knowing, intelligent, and voluntary even after Garber's response, and

22

that the Virginia Supreme Court's refusal to suppress the confession was reasonable.

Finally, Mueller also claims that he repeatedly invoked his right to remain silent during the course of his February 12, 1991, interrogation by demanding that he be taken to jail. Br. of Appellant at 21. Mueller did not object to the Magistrate's Judge's failure to address the merits of this claim, and as a result has waived his right to raise the claim on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.3d 841, 846 (4th Cir. 1985). Petitioner's interest in pursuing this particular element of his Miranda claim has been sporadic at best. Although petitioner addresses his claim that the officers violated his rights under Miranda by disregarding these statements in only the most cursory fashion in his written submissions to this court, thereby guaranteeing a proportionately limited response by appellee, his able counsel made the claim the centerpiece of oral argument.

Even were we to consider this final Miranda claim on the merits, we would find no basis for disturbing the state court's judgment. The Virginia Supreme Court considered this claim on direct appeal and concluded that Mueller's repeated demands were "simply impatient gestures and that they did not constitute an invocation of his right to terminate the interrogation." 422 S.E.2d at 387. Petitioner does not dispute the Virginia Supreme Court's recitation of these facts surrounding his statements evidencing a desire to be taken to jail: Mueller continued to talk to the investigators after each such statement; when asked whether he would rather talk to other officers Mueller replied "I've been talking to you guys for four months. I've established a pretty good relationship with you guys;" he had demonstrated on two previous occasions with these same officers that he clearly knew how to stop an interrogation when he so desired. Mueller, 422 S.E.2d at 386. Thus, even had petitioner not waived the right to appeal the dismissal of this element of his Miranda claim, we would conclude that the state court's determination that Mueller had not attempted to terminate the interrogation or invoke his right to remain silent was not, on these facts, unreasonable. 28 U.S.C. § 2254(d)(2).**12**

_____

**12** Mueller also argues that his appeal should be "suspended without prejudice" while we remand to the district court with orders for that court

23

IV.

Petitioner next contends that the Virginia Supreme Court's denial of his claim that his rights under Brady v. Maryland, 373 U.S. 83 (1963), were violated when the prosecution failed to disclose certain exculpatory evidence involved an unreasonable application of the law of that decision to the facts of his case.[13] Under Brady and its progeny, the prosecution's failure to disclose exculpatory evidence -- that is, evidence that is "favorable to an accused" -- violates a defendant's right to due process "only where there exists a `reasonable probability' that had the evidence been disclosed the result of the trial would have been different," which is to say only where the suppression "undermine[s] confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 681 (1985). Because we disagree with petitioner that the Virginia Supreme Court's disposition of his Brady claim involves an application of clearly established Supreme Court precedent that reasonable jurists would agree is unreasonable, we conclude that he is not entitled to habeas relief under section 2254(d).

Mueller argues that the Commonwealth violated his right to due process under the Brady line of cases by failing to inform him before

_____

to secure and, presumably, view the videotape of his confession. Petitioner claims that he was denied the review to which he was entitled when the Commonwealth neglected to have the videotape transferred from the state court despite its representation to the district court that it would do so. However, because the district court's resolution of petitioner's claims did not require, as ours does not, review of the tape, and because the district court did not purport in any way to have relied on it, we deny this request.

[13] Mueller also argues on appeal that because the prosecution's actions amounted to "the functional equivalent of the presentation of false testimony," they were reviewable under the less stringent standard applicable to claims that the prosecution knowingly introduced perjured testimony. See Giglio v. United States, 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. 264 (1959). Because Mueller did not advance this Giglio claim in state court, it is procedurally defaulted, see, e.g., Gray v. Netherland, 99 F.3d 158 (4th Cir. 1996), and because Mueller has demonstrated neither cause and prejudice nor a fundamental miscarriage of justice that would excuse the default, we will confine our review to his Brady claim.

24

trial that Kevin Speeks, the prosecution witness who testified to seeing a man driving a wood-sided station wagon through the parking lot near Charity Powers on the night of her disappearance, and several of his friends, had been shown a photographic lineup by police in the days following the murder. After Speeks testified at trial that he had seen a man standing near Charity in the Hardee's parking lot on the night of her disappearance, he stated on cross-examination that the police had shown him photographs of seven individuals, and he had picked out the one most resembling the man he had seen in the Hardee's parking lot. According to his testimony, the police did not say anything to Speeks about the lineup before or after. The defense moved for a mistrial because they had never been told by the prosecutors that this photographic lineup had even taken place, let alone its results. The prosecutors asserted that this was the first that they had heard about the matter as well, and the court directed them to look into it further. At a subsequent hearing on the mistrial motion, the prosecutors informed the trial court that they had been unable to confirm which officers had shown Speeks the photographs, or whose pictures were included in the lineup. The trial court denied Mueller's motion for a mistrial. When the Commonwealth recalled Speeks, he simply testified that he and several other individuals had been shown pictures, and that he had told the police that one photograph resembled the person he had seen but that he "couldn't be positive it was the guy." J.A. at 848.

The Virginia Supreme Court rejected Mueller's <u>Brady</u> claim on the merits on direct appeal. <u>Mueller I</u>, 422 S.E.2d at 394. Noting that Speeks had only selected the photograph of the man most resembling the individual he saw in the parking lot, and that the court had no evidence before it that Speeks was even shown a photograph of Mueller or of "any specifically identified individual," the Virginia Supreme Court concluded that the information was not exculpatory and thus that no <u>Brady</u> violation had occurred. <u>Id</u>.

Although we would likely agree with petitioner that the undisclosed evidence is marginally exculpatory, we cannot say that the Virginia Supreme Court's conclusion to the contrary is one that reasonable jurists would find unreasonable.**14** Even more significant,

_____

**14** Although Speeks was not presented as an identification witness, and none of the other three friends testified at all, he did testify that he had

25

however, is petitioner's inability to demonstrate a reasonable proba-
bility of a different result at trial had the prosecution disclosed the
assertedly exculpatory information.

First, and most obviously, the Commonwealth's failure to disclose
this information was not material in this way because the evidence
was revealed during the trial. See United States v. Agurs, 427 U.S. 97,
102 (1976) ("Brady . . . involves the discovery, after trial of informa-
tion which had been known to the prosecution but unknown to the
defense.") (emphasis added). Thus, the defense had ample opportunity
to use Speeks' possible failure to identify Mueller to his advantage --
and it did so in its summation. See J.A. at 961. Second, the prosecu-
tion relied on Speeks' testimony only for the limited purpose of cor-
roborating Mueller's own recollection of his whereabouts and actions
on the night of the murder. Even as late as the time of his state habeas
petition, Mueller admitted that he was at Hardee's the night of the
murder, and that he saw Charity Powers there. J.A. at 1146, 1156
(affidavit of Everett Lee Mueller). Thus, whether Speeks and his
friends could identify Mueller as the man they saw at Hardee's was,
for all practical purposes, irrelevant.

Finally, Everett Lee Mueller confessed, on videotape, to having sex
with and murdering Charity Powers. Mueller then led the police,
again on videotape, to the wooded area where he had burned Chari-
ty's clothing and personal effects. The police testified that without his

_____

seen a man fitting Mueller' general description, and driving a car like his,
in Charity's vicinity on the night she disappeared. Evidence that Speeks
had participated in a lineup and selected someone as most resembling the
man he saw in the parking lot, combined with the fact that the govern-
ment failed to produce or introduce the results of that lineup is, it seems
to us, at the very least favorable to Mueller. This evidence could tend to
suggest either that Speeks had not identified Mueller from a lineup in
which Mueller's photograph appeared, or that Speeks failed to identify
the individual most resembling Mueller from a lineup in which Mueller's
photograph did not appear or identified an individual not resembling
Mueller at all. However, the favorable nature of such speculative and
indeterminate evidence is not obvious, and we would not go so far as to
conclude that the Virginia Supreme Court's unwillingness to characterize
it as such was unreasonable.

help, they "would never have found" these items because the area was a "dumping ground." J.A. at 834. Mueller pointed out where he had lost his knife -- the same area in which police had found one. And he pointed out the spot where he had intercourse with the ten-year old Charity -- it was fifteen feet from where the knife had been found. J.A. at 836. The introduction by the defense of evidence that Speeks and others had picked someone out of a photographic lineup as most resembling the man they had seen at Hardee's could not, in fact did not, in any way undermine the overwhelming effect on the jury of Mueller's detailed confession to the heinous crime and the corroboration provided by his leading of the police to the location and further evidence of its commission. Indeed, we are confident that there was no probability, let alone the reasonable one that Brady requires, of a different outcome had the prosecutor turned over this information in advance of trial. Accordingly, we dismiss petitioner's contention that the district court erred in not granting his application for habeas relief under section 2254(d) on his Brady claim.

V.

Petitioner's final substantive claim is that he was denied effective assistance of counsel at trial. He argues that his trial counsel were constitutionally ineffective by not investigating or presenting evidence about his susceptibility to giving a false confession, not investigating or presenting evidence of the possibility that someone other than him committed the crime, and by conceding his guilt on the elements of the capital offense while failing to offer the jury a first-degree murder alternative that it could legitimately choose consistent with those concessions. Petitioner's first two claims were denied on the merits by the Virginia Supreme Court on habeas appeal, and we agree with the district court that their rejection did not rest on an application of the two-prong standard for ineffective assistance established in Strickland v. Washington, 466 U.S. 668 (1984), that reasonable jurists would find unreasonable. The last two claims were procedurally defaulted on state habeas appeal, and because petitioner can demonstrate neither cause and prejudice nor a fundamental miscarriage of justice, are barred from our consideration on federal habeas review.

In order to establish a claim of constitutionally ineffective assistance of counsel, petitioner must demonstrate both that his counsel's

27

performance fell below an objective standard of reasonableness and that counsel's deficient performance was prejudicial. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In evaluating trial counsel's performance, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. With respect to the prejudice prong, it is satisfied only if petitioner can demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. Even then, however, we may only grant habeas relief under Strickland if the "result of the proceeding was fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993); Sexton v. French, 163 F.3d 874, 882 (1998).

A.

Petitioner's first ineffective assistance claim, that his trial counsel were deficient in failing to investigate and present evidence of his susceptibility to giving a false confession, falls well short of satisfying Strickland's performance prong. Mueller argues that his attorneys were deficient in not pursuing and presenting "evidence" of the combustible combination of his particular psychological vulnerability -- due primarily to his history of drug and alcohol abuse -- and the coercive nature of the police harassment and interrogation to which he was subjected. As the Supreme Court recognized in announcing the Strickland standard, however, the objective reasonableness of an attorney's actions in representing his client

> may be determined or substantially influenced by the defendant's own statements or actions. In particular, what investigation decisions are reasonable depends critically on such information.

Id. at 691. One of Mueller's two trial counsel submitted an affidavit -- which was included in the Commonwealth's motion to dismiss upon which the state habeas court relied in rejecting Mueller's Strickland claim -- averring that Mueller had, until shortly before trial, consistently admitted his guilt to his attorneys and maintained to them that his confession was truthful. J.A. at 1499-1500.**15** We can-

_____

**15** Petitioner relies on a recent unpublished per curiam opinion of this court for the proposition that "a district court may not credit an attorney's

28

not say, then, that it was objectively unreasonable for counsel to opt not to expend investigative energies and resources on their client's susceptibility to false confession where the client had assured them that his confession was true. See Strickland, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."); Barnes v. Thompson, 58 F.3d 971, 979-80 (4th Cir. 1995) ("[T]rial counsel . . . may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation."). Just as obviously, counsel could not reasonably base his trial strategy on evidence of defendant's susceptibility to false confessions when the defendant himself had admitted the truthfulness of his confession and his sole responsibility for the crime.

Even if we were persuaded that Mueller's trial counsel might have profitably pursued such "leads," petitioner has not satisfied his burden of demonstrating that their failure to do so fell outside the wide range of reasonable professional assistance. In fact, petitioner has not cited a single case in which trial counsel, charged with representing a defendant who had confessed to the crime not only on videotape but

_____

affidavit over a petitioner's verified papers without conducting an evidentiary hearing." United States v. Crawford, 161 F.3d 4, 1998 WL 610870 (4th Cir., Sept. 3, 1998). Of course, unpublished opinions are not binding in this circuit. See Local Rule 36(c); Hogan v. Carter, 85 F.3d 1113, 1118 (4th Cir. 1996). More importantly, Crawford is readily distinguishable from this case. Crawford involved a petitioner who claimed ineffective assistance for failure to comply with his request to file an appeal. Such a claim pits only the word of the attorney against that of the client. In this case, the state habeas court also had before it substantial evidence pointing to the truth of the confession: Mueller led police to the place where he had burned Charity's clothing and jewelry, to where he had lost the knife, and to where he had sex with the victim. Thus, unlike in Crawford, there was a substantial independent basis for crediting the attorney's affidavit over his client's self-serving statement on habeas that he had steadfastly -- since his confession, that is -- maintained his innocence. See Drew v. Collins, 964 F.2d 411, 422 n.12 (5th Cir. 1992) (holding that state habeas court could evaluate ineffective assistance of counsel claim based on affidavits of petitioner and attorney).

29

to counsel themselves, nonetheless pursued a "false confession" line of defense. Trial counsel in this case did what reasonable attorneys are wont to do when their client has confessed on videotape to the grisly details of a heinous crime -- they moved to suppress. We decline to hold that trial counsel were under any constitutional obligation, when that motion was unsuccessful, to attack as false a confession their own client had acknowledged was true.

In any event, even were we to find that counsel's performance fell below an objective standard of reasonableness, we can identify no prejudice under Strickland from their failure to investigate and pursue this "lead." In our view, evidence of Mueller's alleged susceptibility to false confession would have been very unlikely to lessen the impact of the defendant's own confession and his ability, after thus unburdening himself, to lead the police to the very area where Charity's body was found.

B.

Petitioner's contention that trial counsel were constitutionally ineffective by failing to pursue "substantial evidence" that someone else may have abducted and murdered Charity Powers similarly fails to satisfy Strickland's first prong. The evidence Mueller now characterizes as substantial was in truth anything but. Mueller argues that trial counsel unreasonably failed to investigate and develop the following three leads. First, he argues that trial counsel should have attempted to identify the source of a single unidentified hair sample recovered by forensic personnel from Charity Powers' anal area, perhaps by compelling comparison of that sample with the hairs of unnamed suspects initially considered but subsequently eliminated by the police. Second, petitioner argues that counsel should have subpoenaed, or at least spoken to, the individuals who in addition to Kevin Speeks had been shown a photographic lineup in the days following the murder. Finally, petitioner argues that counsel should have conducted further investigation after learning from Ms. Deborah Pruitt, a neighbor of Mueller's, of two vehicles similar to his in the area on the night of the murder.

In determining whether counsel's performance in failing further to investigate these "leads" was constitutionally deficient, we recall

30

Strickland's admonition that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful," counsel's decision not to pursue "those investigations may not later be challenged as unreasonable." 466 U.S. at 691. Given Mueller's statements to counsel confirming the substance of his confession, we cannot say that counsel were unreasonable in deciding not to pursue further the defense that someone else committed the crime to which he had confessed. And, even were we not to credit trial counsel's affidavit that Mueller had admitted his guilt, Mueller has not forecast what evidence, specifically, his counsel could reasonably have hoped to find as a result of the investigation.

First, with respect to the stray hair sample, we note that to this day, even after having had the assistance of an investigator at the state habeas level, petitioner has not suggested the identity of any other suspect to whom the hair might have belonged. Thus, counsel had no potential match for the lone stray hair, and we cannot say that it was unreasonable for him not to search high and low for its source. Rather than expend investigative energies and resources trying to match the hair to someone in Chesterfield, counsel opted instead simply to present at trial the evidence of an unidentified hair on the victim's body. J.A. at 961.

As for counsel's performance in pursuing the evidence of the photographic lineup and following up on the interview with Ms. Pruitt, there simply was no reason for them to expend resources doing either. Even crediting petitioner's affidavit, trial counsel knew that their client had been at the Hardee's, and had seen Charity Powers in the parking lot, on the night of the murder. J.A. at 1146, 1156. Trial counsel also knew that there simply was no evidence, even today, that Speeks' friends could have identified any other suspect in this case. Thus, the best counsel could have reasonably hoped for was that they, like Speeks, could testify that they had picked someone out of a lineup, so that counsel might ask the jury to draw the inference from the prosecution's failure to introduce this evidence that they had not identified Mueller. This information -- which in any event counsel had imparted to the jury through his cross of Speeks and through his summation -- was of no use at all, as Mueller, by his own admission, was at Hardee's on the night of the murder. Counsel's first response to the disclosure of this information had been to move and then ably

31

argue for a mistrial under <u>Brady</u>. It is clear, then, that once trial counsel learned of the photographic lineup they reasonably used it to their client's advantage in a manner consistent with the knowledge that he had, by his own admission, been at Hardee's on the night of the murder.

Similarly, with regard to Ms. Pruitt, we note as an initial matter that trial counsel did interview her. But in light of the information available to counsel that Mueller was at Hardee's, presumably in his vehicle, on the night of the murder, we cannot say that it was objectively unreasonable for counsel not to track down two individuals suspected of nothing more than owning a tan, wood-paneled station wagon.

In sum, we decline to find that it was unreasonable for counsel to fail to investigate whether someone else was responsible for Charity's rape and murder when their own client had confessed responsibility, not only to the police but to the attorneys themselves. And, even if it were, given the evidence of petitioner's guilt in this case, recited in detail in the previous section, our confidence in the outcome of the trial is not at all disturbed by counsel's asserted investigative failings. Accordingly, because the Virginia Supreme Court's resolution of petitioner's first two ineffective assistance claims was not only reasonable under <u>Strickland</u> but undoubtedly correct, we agree with the district court that he is not entitled on the basis of these claims to habeas relief under section 2254(d).

C.

We turn finally to Mueller's claims that trial counsel were constitutionally ineffective in conceding during closing argument that Mueller killed Powers subsequent to raping her (which elements together with the third element of "premeditation" constitute the offense of capital murder) and, relatedly, in failing to request a viable first-degree murder instruction in light of those concessions. Petitioner included these claims, along with fifty-three others, in two footnotes appearing on the final two pages of his petition for appeal to the Virginia Supreme Court. Noting simply that he could not "present appropriate argument" on these claims "because of the page limit imposed in this petition," petitioner purported in these two footnotes to "incorporat[e] by

32

reference" arguments made in his 217-page petition for Writ of Habeas Corpus in the trial court. The Virginia Supreme Court on habeas appeal dismissed all fifty-five footnoted claims, and only those claims, as defaulted under its Supreme Court Rule 5:17(c), which provides, in pertinent part, as follows:

> [T]he petition shall list the specific errors in the rulings below upon which the appellant intends to rely. . . . An assignment of error which merely states that the judgment or award is contrary to the law and the evidence is not sufficient. . . .
>
> The petition shall also contain:
>
> . . .
>
> (4) The principles of law, the argument, and the authorities relating to each assignment of error. With respect to each assignment of error, the principles, the argument, and the authorities shall be stated in one place and not scattered throughout the petition . . . .

Finding that Rule 5:17(c) constituted an "independent and adequate state grounds" for dismissal, and finding neither cause and prejudice nor a fundamental injustice that would excuse the default, the district court in turn held that it was barred from reviewing any of the claims procedurally defaulted under Rule 5:17(c). Although we do question state habeas counsel's judgment in briefing some twenty-two other claims in full, while relegating these two, along with fifty-three others, to a pair of footnotes at the very end of an already overlength petition, we agree with the district court's judgment that we are, as a result of that strategic decision, barred from reviewing these claims.

As the district court noted, the Virginia Supreme Court's conclusion that these claims were defaulted bars them from our consideration, absent cause and prejudice or a miscarriage of justice, so long as Rule 5:17(c) is an independent and adequate state grounds for decision. See, e.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Yeatts v. Angelone, 166 F.3d 255, 260 (1998). In Yeatts, we recently reiterated

33

the familiar standard that a state procedural rule is "adequate" if it is firmly established and regularly or consistently applied by the state court and independent if it does not depend on a federal constitutional ruling. Id. at 263-64. Mueller argues on a number of grounds that the state court's dismissal of these claims is inadequate to bar federal review. These arguments are all without merit, and we consider them in turn.

First, petitioner contends that we are not barred from reviewing these Strickland claims because the state court failed to make a sufficiently explicit statement of the state law ground for dismissing them. Petitioner's argument relies on a misapprehension of the Supreme Court's holding in Harris v. Reed, 489 U.S. 255 (1989). In that case, the Court held that federal review would not be barred absent a "clear statement" that the state court in rendering its judgment relied on a state law procedural ground, as opposed to an application of federal law, for its dismissal of a federal claim. Id . at 263. Here, unlike in Harris, there simply is no question that the state court rested its judgment on state procedural grounds rather than on the merits of the claims. In limiting its award of an appeal to a single assignment of error, the Virginia Supreme Court stated, in reference to the fifty-five footnoted claims, that it was of the opinion that "Mueller has defaulted on all these claims under Rule 5:17(c)." In contrast, with respect to the claims that were not dismissed on some or other state law procedural grounds, the Virginia Supreme Court clearly stated that they were "without merit." This type of unequivocal distinction between those claims that are dismissed on state procedural grounds and those that are denied for lack of merit is all that Harris requires.

Next, we reject Mueller's contention that Rule 5:17(c) cannot bar review because the thirty-five-page limit it imposed on his petition actually prevented him from presenting his claims in compliance with the rule.[16] Mueller cites Reese v. Peters, 926 F.2d 668 (7th Cir. 1991), in support of this claim. In Reese, the Seventh Circuit stated that "[w]hen state law does not allow the prisoner to present a particular

_____

[16] Of course, petitioner's argument that the page limits prevented him from complying with the rule serves as confirmation, if any were needed, of his acknowledgment that he did not in fact comply with the rule in presenting these claims.

34

claim, the omission -- submitting to limitations established by law -- is not an independent and adequate state ground precluding federal review." Id. at 670. In Weeks v. Angelone, 1999 WL 288504 (4th Cir. May 10, 1999), we recently considered and rejected application of Reese to the very different circumstance of page limitations. We concluded that a page limitation "merely limited the manner in which [petitioner] could present his arguments; it did not wholly prevent him from presenting them," as was the case in Reese. Id. at *20.

Finally, petitioner argues that Rule 5:17(c) is neither "firmly established" nor "regularly followed" because certain of its provisions, and specifically its page limitations, are entirely discretionary.**17** However, it is clear that the Virginia Supreme Court did not dismiss Mueller's Strickland claims as procedurally defaulted because his petition for appeal was too long. In fact, although the petition was twelve pages overlength, the Virginia Supreme Court did not dismiss as procedurally defaulted under Rule 5:17(c) any of the other claims raised or discussed in those excess pages. Rather, the court dismissed only the scores of claims strung together, without support or explanation, in the two footnotes on the final two pages. We can only reasonably conclude, then, that the assignments of error asserted therein were defaulted not because the petition was too long, but because they lacked either the specificity or the support the rule explicitly and unambiguously demands, or both. And petitioner has not even suggested, let alone demonstrated, that these requirements are not firmly established or regularly enforced.

Nonetheless, because we find the underlying claims at least troubling, we have considered ourselves whether these procedural grounds are indeed "firmly established" and "regularly enforced" so as to bar federal review, notwithstanding petitioner's own tacit concessions -- manifested in the absence of any suggestion to the contrary in the briefs and in able appellate counsel's failure even to mention the claims at oral argument -- that they are.

_____

**17** Rule 5:17(c) establishes that

> [e]xcept by leave of a justice of this Court, a petition for appeal shall not exceed 35 typed or 25 printed pages.

35

The rules governing the "Form and Content" of petitions for appeal to the Virginia Supreme Court have long been explicitly tied to the rules governing the same with respect to opening briefs on appeal. Indeed, through 1992, Rule 5:17(c), the "Form and Content" subsection of the general rule governing petitions for appeal, directly incorporated the requirements of Rule 5:27, which supplied the standards for opening briefs. Va. Sup. Ct. R. 5:17(c) (1992) ("The form and contents of the petition for appeal shall conform in all respects to the requirements of the opening brief of appellant (Rule 5:27).")). At the end of that year, the two rules were amended, with the primary effect of reversing the direction of the incorporation. That is, Rule 5:17(c) was amended to include expressly, with only superficial modifications, the very requirements theretofore enumerated in Rule 5:27. In turn, Rule 5:27 was amended simply to incorporate the "Form and Content" requirements now explicitly laid out in the new Rule 5:17(c). Whatever the explanation for the 1992 change, its import for purposes of our analysis lies in what was <u>not</u> amended: the Virginia Supreme Court's long-standing requirement that petitions for appeal and opening briefs conform to the same standards of presentation.

This substantial identity between the Form and Content requirements of petitions for appeal and opening appellate briefs is significant because while awards and denials of appeal are only infrequently reported, published decisions interpreting and enforcing Rule 5:27 on appeal are abundant. And review of those decisions leaves no room for doubt, as petitioner obviously recognizes, that the Virginia Supreme Court will, in applying the terms shared by the two rules, consider as waived an assignment of error presented without supporting argument or authority. <u>See Weeks</u> v. <u>Commonwealth</u>, 248 Va. 460, 465 (1994) (refusing to consider on direct appeal ten assigned errors appellant failed to brief or argue); <u>Quesinberry</u> v. <u>Commonwealth</u>, 241 Va. 364, 369 (1991) (deeming as waived issues to which appellant assigned error but failed to argue on brief); <u>Savino</u> v. <u>Commonwealth</u>, 239 Va. 534, 547 n.4 (1990) (declining to consider claims where "[t]he principles of law, the argument, and the authorities relating to" them were not included in appellant's brief); <u>Stockton</u> v. <u>Commonwealth</u>, 241 Va. 192, 217 (1991) (refusing to consider "issues raised in assignments of error [appellant] has not briefed," and rejecting appellant's attempt to "place the blame on this Court for refusing to grant him leave to file a brief in excess of the 50-page lim-

36

itation"). In addition, the court has explicitly stated on more than one occasion that it will not consider the requirement satisfied by "incorporation by reference" of arguments made below in order to circumvent page limitations. Williams v. Commonwealth, 248 Va. 528, 537 (1994) (declining to consider arguments "incorporate[d] by reference" to arguments made in proceedings before trial court (citing Mickens v. Commonwealth, 247 Va. 395, 401 n.4 (1990), vacated on other grounds sub nom., Mickens v. Virginia, 513 U.S. 922; Jenkins v. Commonwealth, 244 Va. 445, 461 (1992))). Thus, even a brief review of Virginia caselaw makes clear why petitioner chose not even to contend that the Virginia Supreme Court has not consistently and regularly dismissed, as defaulted, claims raised in such cursory fashion as the fifty-five Mueller "incorporated by reference," without argument or authority, in the final two footnotes of his petition for appeal.

Similarly, even were we to believe (which we do not) that the Virginia Supreme Court in dismissing the claims under Rule 5:17(c) meant to rely exclusively on the rule's requirement that "the petition shall list the specific errors in the rulings below upon which the appellant intends to rely," and not upon that portion of the rule requiring explanation and authorities, we would still have no difficulty in concluding that that rule is likewise an adequate one. In Yeatts, we rejected the argument that Rule 5:17(c), which had been "applied . . . numerous times prior to the date [petitioner] filed his petition for appeal to refuse to address issues that were not preserved properly with specific assignments of error," is not "firmly established." And in that case, where we held that "consistent or regular application of a state rule of procedural default does not require that the state court show an undeviating adherence to such rule admitting of no exception," so long as the rule has "as a general rule, . . . been applied in the vast majority of cases," id. (internal quotations and citation omitted), the petitioner had at least presented the court with one instance where the state court had not applied the rule on facts similar to those of his case. Mueller, because he does not contest the adequacy of the rule's application on these grounds either, has not even shown that much. For these reasons, we find, as the district court did, that Mueller's procedural default under Rule 5:17(c) is an independent and adequate state bar to his last two Strickland claims.**18**

_____

**18** In a single sentence in his reply brief that seems no more than an afterthought, petitioner lists five other grounds upon which, assertedly,

37

Of course, we may nonetheless excuse petitioner's procedural default for cause and prejudice, or if a fundamental miscarriage of justice would result from failure to do so. Harris v. Reed, 489 U.S. 255, 262 (1989). The existence of cause for procedural default "ordinarily turn[s] on whether petitioner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). The only asserted "cause" for petitioner's procedural default (although petitioner does not frame it as such) is the page limitation considered above. The actual cause of default in this case is not the page limit, however, but rather petitioner's strategic choice of which of his manifold claims to focus on. See Weeks v. Angelone, 1999 WL 288504, at *20. (It bears repeating that petitioner sought to raise some seventy-seven claims, fifty-five of them only by reference in the two concluding footnotes.) The existence of a page limitation that affords a petitioner ample opportunity to present numerous claims, forcing only some small measure of strategic choice, is not at all problematic. As the Supreme Court has recognized,

> [t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. This has assumed a greater importance in an era when oral argument is strictly limited in most courts -- often to as little as 15 minutes -- and when page limits on briefs are widely imposed. . . . A brief that raises every colorable issue runs the risk of burying good arguments -- those that, in the words of the great advocate John W. Davis, "go for the jugular," -- in a verbal mound made up of strong and weak contentions.

Jones v. Barnes, 463 U.S. 745, 752-53 (1983) (citation omitted). Peti-

_____

"[a]pplication of state Va. S. Ct. R. 5:17 also fails." Reply Br. of Petitioner-Appellant at 24. None of these has any merit. Even more telling, however, is the fact that not even among these completely meritless claims does petitioner so much as suggest that Rule 5:17(c)'s specificity and support requirements are not firmly established or regularly enforced.

38

tioner has not demonstrated -- or even argued-- that Rule 5:17(c)'s thirty-five-page limit on petitions for appeal is unreasonable. Nor has he suggested or presented evidence, as the defendant did in Weeks, that he filed a motion to file an oversize brief that was denied.**19** Absent a showing that the page limitation is unfairly or arbitrarily enforced, we again decline, as we recently did in Weeks, to hold that the mere existence of another reasonable procedural rule and the requirement that an appellant abide by it constitute cause for a procedural default.**20** Cf. Hill v. Norris, 96 F.3d 1085, 1087-88 (8th Cir. 1996) (declining to find cause to excuse procedural default where state habeas petitioner failed to file motion to file an overlength petition).

Finally, given the overwhelming evidence of petitioner's guilt in this case -- including his own videotaped confession to the murder and the independent corroboration he provided by leading police to evidence and the scene of the crime -- we can discern no miscarriage of justice in not excusing the default. Whatever else the petitioner may have shown on this appeal, one thing we can say with absolute certainty that he has not demonstrated is that the alleged constitutional violation probably resulted in the conviction of one who is actually innocent. Schlup v. Delo, 513 U.S. 298, 326 (1995). Accordingly, finding neither cause and prejudice nor a miscarriage of justice, we agree with the district court -- as we infer petitioner himself really does as well -- that the Virginia Supreme Court's reliance on its own independent and adequate procedural rule bars our review of petitioner's final two ineffective assistance of counsel claims.

Even were we convinced otherwise, we would almost certainly reject petitioner's necessary claim that he was prejudiced by any objectively unreasonable performance by counsel.**21** In the face of

_____

**19** On the contrary, as we have indicated, Mueller's petition was itself, at forty-seven pages, by all appearances considerably overlength. There is no indication in the record whether he had obtained leave to file an oversized petition.

**20** We note that the United States Supreme Court limits petitions for certiorari to 30 pages and opening briefs to 50 pages. See S. Ct. R. 33.1(g).

**21** It may be that we would ultimately conclude that counsel's performance in closing argument was unreasonable. However, we would be

39

defendant's videotaped confession and the powerful evidence derived therefrom, it is virtually impossible for us to imagine that he could carry the burden of establishing prejudice from his counsel's perfor-

_____

most hesitant to so conclude. Counsel was confronted with an essentially impossible situation. In confessing to having had sex with the ten-year-old Charity and having killed her to prevent her from telling anyone what he had done, Mueller himself had confessed to all of the elements of capital murder: a premeditated killing subsequent to a rape. Counsel could have argued that Mueller had not actually confessed to all of these elements or he could simply have chosen not to remind the jury of the confession in any way. But in an apparent effort to gain credibility with the jury, instead he decided to acknowledge forthrightly what the jury already knew -- that his client had, as he had confessed, raped and killed Charity Powers. Having gained whatever credibility with the jury that he could from this candid acknowledgment, he then proceeded, rather effectively, to introduce doubt about whether Mueller intended to defile Powers -- arguably the only basis for a capital murder conviction as to which he could credibly and legitimately raise doubt consistent with the confession itself -- and, ultimately, to ask the jury to show mercy and consider convicting his client only of the rape and first degree murder offenses with which he was also charged. We recognize that given the concessions and the instructions, it may not have been technically or logically possible for the jury to find the elements of first degree murder -- a premeditated killing -- without at the same time finding Mueller guilty of capital murder -- a premeditated killing subsequent to the commission of a rape. For, once the jury found the premeditation necessary to the first degree murder conviction, it theoretically would, based upon counsel's acknowledgment, also have found Mueller guilty of capital murder. Even so, it is not clear to us that this was not at least as reasonable a course to take as offering an alternative first degree murder instruction that omitted the element of premeditation and then arguing, in the face of his client's videotaped confession, that Mueller had not premeditated Powers' murder. In other words, this may well have been the very case where an appeal to logic and reason in the end would, given the evidence of premeditation, have disserved the defendant's interests. See United States v. Cronic, 466 U.S. 648, 657 n.19 (1984) ("Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade."). Once petitioner's motion to suppress was denied, there simply were not many, if indeed any, options available to counsel during trial that would not permit post hoc charges of ineffective assistance.

40

mance. The jurors heard on videotape, from the defendant's own mouth, that he raped the ten-year old Charity and then killed her to keep her from talking; they watched the videotape showing him lead the police to the scene and evidence of the crime and to Charity's makeshift grave; and they listened to the coroner describe the manner in which the young girl's throat had been slit and her nipples possibly cut off. Mindful of these facts, we could hardly conclude that it was reasonably probable that, but for counsel's asserted errors, a different result would have obtained.**22**

VI.

Finally, petitioner argues that the district court erred in denying his request for an evidentiary hearing on his Brady and related ineffective assistance claims. In support of his request for an evidentiary hearing under § 2254(e)(2), petitioner submitted affidavits from Kevin Speeks and Stephen Cooper, one of the individuals who was with Speeks in the Hardee's parking lot on the night of Charity's disappearance, about their respective participation in photographic lineups. J.A. at 196-98. The district court adopted the Magistrate Judge's conclusion that these affidavits did not add to the information that was before the Virginia Supreme Court in 1992, and did not raise factual contentions that, if true, would require the court to grant Mueller habeas relief. We agree.

In his affidavit, Speeks states that he was asked "to look at 7 or 8 Polaroid photos of men to see if we could pick out the man we saw at the Hardee's," and that "[a]fter viewing the photos, [he] made a selection." Speeks further asserted that he and his three friends "compared notes" about the photo lineups they had participated in, and that "each . . . had selected one of the photos as the person [he] saw at the Hardee's from among those spread out." J.A. at 197. Stephen Cooper's affidavit is even less illuminating, as he confirms only that he was shown such a lineup. These facts, even if true, add nothing of

_____

**22** Petitioner also urges us to consider the cumulative effect of his ineffective assistance of counsel claims rather than whether each claim, considered alone, establishes a constitutional violation. This argument is squarely foreclosed by our recent decision in Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998).

consequence to either Mueller's Brady or ineffective assistance claims, discussed at length above, and we therefore hold that the district court did not err in refusing to grant Mueller an evidentiary hearing. See, e.g., Cardwell v. Greene, 153 F.3d 331, 338 (4th Cir. 1998); Beaver v. Thompson, 93 F.3d 1186, 1190 (4th Cir. 1996).

CONCLUSION

For the reasons stated herein, we deny the motion for a certificate of appealability and dismiss the appeal.

DISMISSED

42